FRANK KUCZYNSKI, BY SOPHIE KUCZYNSKI, HIS NEXT FRIEND, PETITIONER-RESPONDENT, v. C. W. HUMPHREY, DEFENDANT-PROSECUTOR.

Argued October 8, 1936—Decided May 28, 1937.

Before Justices TRENCHARD, BODINE and HEHER.

For the prosecutor, *Morgan R. Seiffert* (*Francis X. Kenneally,* of counsel).

For the respondent, *Joseph T. Karcher.*

The opinion of the court was delivered by

HEHER, J.   The decisive inquiry in this action, instituted under the Workmen's Compensation act of 1911 (*Pamph. L., pp.* 134, 763), as amended, is whether the Middlesex Common Pleas erred, to the prejudice of prosecutor, in the admeasurement of the disability consequent upon a compensable injury concededly suffered by the respondent employe by an accident arising out of and in the course of his employment; and we resolve it in the negative.

On June 8th, 1929, respondent, while in prosecutor's service as a carpenter, fell a distance of approximately thirty feet as a result of the collapse of a scaffold upon which he was working. He has since been incapacitated. Severe physical injuries were followed by mental derangement requiring his commitment, on October 19th, 1934, to the state hospital for the insane at Trenton. He sustained a compression fracture of the fourth dorsal vertebra, a fracture of the posterior portion of the fifth lumbar vertebra, and fractures of the scaphoid bone and of the astragalus and os calcis of the right foot.

For these physical injuries, respondent was allowed, sometime in 1931, in an informal proceeding under the statute, compensation on the basis of forty per cent. of total permanent disability.

The instant petition, filed on March 14th, 1935, within the period limited by the statute, alleges a "head injury" productive of mental impairment, as well as the mentioned physical injuries, with a resultant "one hundred per cent. of total permanent disability," and prays for compensation accordingly. The deputy commissioner dismissed the petition. Finding insanity, he concluded it was not a consequent of the accident, and that full compensation had been made for the physical injuries suffered. The Pleas ruled that the mental disturbance was attributable to the accident; and there was a finding also of physical disability in addition to that "found at the first hearing." Respondent was given an additional award of thirty-five per cent. of total permanent disability.

There was evidence that the physical injuries alone had resulted in excess of ninety per cent. of total permanent incapacity. It was found necessary, in May, 1930, to effect a "fusion of four vertebrae" (by the grafting thereon of pieces of the victim's shin bone) ; and this, according to a medical specialist called as a witness by prosecutor, had eliminated "rotary motion" and "abolished the mobility of these vertebrae," with the consequence that—so runs the expert testimony adduced on respondent's behalf—"the patient's ability to lift or use the back in any of the usual functions was entirely lost."

But we find it unnecessary to measure the disability ensuing from the physical injuries alone. The psychosis adverted to is directly traceable to the accident. The proofs lead to the conclusion that, in all human likelihood, the injured employe suffered, by reason of the fall and the consequent injury to the spinal column, a concussion of the brain and an impairment of its substance that eventuated in derangement of function. The injured vertebrae house the spinal cord; and it is conceded that brain concussion was a probable consequence. One of the employer's medical experts, Dr. Blumberg, testified that the shock, communicated to the brain through the spinal cord as a result of the compressed fracture of the dorsal vertebra—"one of the heaviest and strongest"—would "in all probability" produce brain concussion, although he doubted there was any injury to the brain substance, and he therefore held to the view that the mental condition was not due to trauma. This witness, it is to be observed. made only one examination of the injured employe.

On the other hand, Dr. Spradley, a specialist in nervous and mental diseases who served on the state hospital staff during the period of respondent's confinement, and who had the benefit of several personal examinations and a long period of observation, testified that concussion flowing from an injury of this character would be severe enough to produce "little petechial pin-point hemorrhages" at the base of the brain, definitely discoverable—in the form of scar tissue—only through an autopsy, but frequently followed by the mental irresponsibility which afflicted respondent. He diagnosed the condition as "post-traumatic constitution," which he defined as "an emotional disturbance of the brain as a result of trauma." He was certain that this mental condition had a traumatic origin. It was "a type of insanity which is characteristic of injuries to the brain;" this "particular condition;" he said, "is caused *only* by trauma." The knowledge gained by study and long experience sustained the conclusion that a trauma severe enough to fracture a vertebra "usually" causes "enough injury to the brain substance to produce this particular set of symptoms;" and, in the absence of evidence

of another "severe" traumatic injury, the fall from the scaffold was indisputably the direct cause of the mental disturbance. This condition, productive of complete disability, was, from a "functional standpoint," permanent. He had "never seen a recovery."

Another specialist of wide experience in mental diseases, Dr. Rothschild, found evidences of "a brain disturbance on the right side." There were indications that "something had happened to the right side of the head, of the brain." He observed the symptoms in the arms and legs.

Prosecutor's medical experts ascribed respondent's abnormal behavior to a "psychopathic personality." But the weight of the evidence plainly negatives this theory. The term was defined as a congenital condition, not classable as a disease; it is "inherent" in the individual. The evidence is overwhelming that, prior to the accident in question, respondent had led a normal and healthy life, fully capable always of performing the laborious service that fell to him. The assault upon his wife in 1926—the one behavioral instance pointed to as evidence of psychopathy prior to the accident—standing alone as it does, is manifestly not indicative of an inherent abnormal condition accounting for the present affliction. Nor is the claim of alcoholism as the basic cause sustained by the proofs.

Thus it is that brain concussion, freely conceded to have been the probable, if not indeed the certain, consequent of the vertebral injury, but characterized as "temporary," was, in the absence of evidence of an unrelated trauma, the only demonstrable causative agent of the subsequent mental aberration denotive of a traumatic brain injury.

We therefore find that there is ample evidence to sustain the *quantum* of compensable disability found by the Pleas. Apart from the general incapacity resulting from the physical injuries, a causal connection between the accidental injury so suffered and the mental derangement is fairly inferable from all the facts and circumstances. That is a probable or more probable hypothesis, with reference to the possibility of other hypotheses. The evidence on the whole lends itself to infer-

ences that bring this within the realm of probability. In civil cases, it is generally sufficient if the circumstantial evidence be such as to afford a fair and reasonable presumption of the facts inferred. Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil causes, is a mere preponderance of probabilities. The evidence, though not reaching the pinnacle of certainty, is yet sufficient to sustain the burden of proof if it attain the level of probability. *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.*, 111 *N. J. L.* 487; *Slayback Van Order Co.* v. *Eiben*, 115 *Id.* 17; *Hercules Powder Co.* v. *Nieratko*, 113 *Id.* 195; *affirmed*, 114 *Id.* 254; *Belyus* v. *Wilkinson, Gaddis & Co.*, 115 *Id.* 43; *affirmed*, 116 *Id.* 92.

Prosecutor invokes the rule, applied in *Migliaccio* v. *Public Service Railway Co.*, 101 *N. J. L.* 496; *affirmed*, 102 *Id.* 442, that "if the wrong and the resulting damage are not known by common experience to be natural and usually in sequence, and the damage does not, according to the ordinary course of events, follow from the wrong, then the wrong and the damage are not sufficiently conjoined or concatenated as cause and effect to support an action." But this doctrine is not apposite here. To borrow the language of this court in *Hall* v. *Doremus*, 114 *Id.* 47, it rests upon the principle that a person is legally responsible only for the natural and proximate results of his *negligent act*. The cause of action here is not predicated upon the violation of a duty that is denominated negligence. The statute awards compensation for personal injuries suffered by accident arising out of and in the course of the employment, if disability results. It is the consequences of disability that it seeks to alleviate. It was designed to effect a measure of economic security for the workman so injured, or his dependents in the event that death ensues, and to place the burden thereof upon industry.

The judgment of the Court of Common Pleas is accordingly affirmed, with costs.